UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DONALD PRYOR,                )
                             )
         Plaintiff,          )
                             )
      v.                     )    No. 1:18-cv-00815-JRS-MJD
                             )
AMERICOLD LOGISTICS, LLC,    )
                             )
         Defendant.          )

**Entry on Defendant's Motion for Summary Judgment**

Plaintiff Donald Pryor alleges claims for disability discrimination against his former employer, Defendant Americold Logistics, LLC, under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Specifically, Pryor alleges that Americold discriminated against him by failing to provide a reasonable accommodation for his disability and by terminating his employment. Americold moves for summary judgment. (ECF No. 52.)

**Legal Standard**

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). However, the district court

1

must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), and does not draw "inferences that are supported by only speculation or conjecture," *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).

To withstand a properly supported motion for summary judgment, Plaintiff "must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing that there is a genuine issue for trial." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**Background**

Americold provides temperature-controlled food warehousing and distribution services. Its Indianapolis warehouse consists of five cooler rooms, two freezer rooms, a loading dock, a designated battery-changing room, and a small office. (Pryor Dep. 14:2–7, 18:8–14, 24:4–5, 27:6–8, ECF No. 53-1.) The cooler rooms, the loading dock, the battery room, and the office are kept at 38 degrees. (Pryor Dep. 14:14–16, 23:20–21, 24:18–20, 27:15–18, 27:23–25.) The freezer rooms are kept at subzero temperatures. (Pryor Dep. 23:17–19.)

Beginning in August 2011, Pryor worked the second shift (6 p.m. to 6 a.m.) at the Indianapolis warehouse as a Lift Truck Operator ("LTO"). (Pryor Dep. 8:17–24, 11:8–

10.) According to the job description, the LTO job classification's physical requirements include "Constant (67%-100% of the time)" exposure to "Temperature Extreme," described as "Freezer zero – negative 5 degrees." (ECF No. 53-15 at 3.)

Within the LTO job title, there were various positions. The order selector (evidently also referred to as "picker") picked the various items for an order from the various rooms, wrapped the order on a skid, and placed the skid in a pick-up spot. (Pryor Dep. 21:15–18.) The runner picked up skids from the pick-up spot and took them to the dock. (Pryor Dep. 21:16–18, 24:6–10.) The loader put the skids on the trucks. (Pryor Dep. 24:6–17.) The stocker refilled the bins when they ran out of product. (Pryor Dep. 66:4–9.) The battery changer changed the batteries on the forklifts. (Pryor Dep. 20:2–4.)

Those positions were awarded through a bidding process based on seniority and training as provided in the collective bargaining agreement. (Devney Decl. ¶ 6; ECF No. 53-8 at 9.) Pryor testified that if an LTO wanted a particular position—*e.g.*, stocker or loader—the employee would bid on an open position under the union contract. (Pryor Dep. 67:25–68:22.) Pryor further testified that he had "no idea" whether those positions were awarded based on seniority. (Pryor Dep. 68:16–18, 68:23–25.) Pryor never bid on a position while at Americold. (Pryor Dep. 28:7–12, 69:1–5.)

Pryor worked as an order selector. (Pryor Dep. 21:15–18.) The controller, who worked in the office, sent the orders to the computer mounted to Pryor's lift truck. (Pryor Dep. 22:4–13.) Pryor's job was to retrieve the items in the order, wrap the order on a skid, and place the skid in a pick-up spot. As an order selector, Pryor did

3

not work in a particular room but instead would "go to various rooms." (Pryor Dep. 21:19–21.) "The order could have product in every room from 7 to 1 to be completed. Sometimes it would just be the freezer." (Pryor Dep. 21:24–22:2.) The amount of time spent in each room varied greatly because "[e]ach room had a particular amount of product that had to be picked. . . . [I]t depended on how fast [the LTO] could pick the order." (Pryor Dep. 23:8–16.) The percentage of time spent in the freezer area varied from day to day for Pryor and all order selectors. (Pryor Dep. 29:3–14.) Pryor elaborated, "[A]ny given time they, the orders will fluctuate from room to room. You are not going to be in there every day, every hour of the day." (Pryor Dep. 78:6–9.) Similarly, John Devney testified that, in a typical day, an LTO "could work anyplace in the warehouse," that no LTOs work exclusively in the cooler, but that an LTO could work in the cooler for an entire shift "if you get lucky." (Devney Dep. 22:3–13.) Pryor and another former order selector, David Williams, testified that a handful of order selectors worked exclusively in the coolers, though neither Pryor nor Williams identified anyone by name. Pryor further testified that the cooler-only job "had a title under the contract with the union," (Pryor Dep. 74:2–6), but Williams stated that such assignments were given at the start of each shift, (Williams Decl. ¶¶7–8).

The other LTO positions—runner, loader, stocker—involved less time in the freezers. The loaders and runners worked in areas kept at the same temperature as the coolers. The stocker would be exposed to the freezer for less time than an order selector because "pickers have sometimes forty-five lines to pick so that is forty-five

4

different locations you are going to pick from. A stocker would bring product from the dock into the freezer, place it in the location and then exit." (Pryor Dep. 71:2–12.)

In October 2013, Pryor suffered severe frostbite on his left hand after he spent three-quarters of a shift in the freezer with defective gloves. (Pryor Dep. 33:9–35:3; ECF No. 53-3 at 2.) As a result of the frostbite, subsequent exposure to the freezer's extreme cold caused pain and risked further injury. (Pryor Dep. 51:10–15.) Pryor was out for several months and received worker's compensation through October 1, 2014. (Pryor Dep. 40:13–25, 42:22–43:7.) While on worker's compensation, Pryor visited several doctors who imposed temporary restrictions barring Pryor from working in "deep cold." (Pryor Dep. 46:22–47:4, 48:24–49:6, 49:24–50:7, 50:21–51:3.)

Americold's Safety Supervisor John Devney asked Pryor to return to work, and Pryor returned in April 2014 for about eight and a half days under Americold's "return-to-work" or "alternate duty" program. (Pryor Dep. 62:1–24, 92:2–14; Devney Dep. 16:8–12, 17:3–8.) Alternate duty is limited to six months. (Devney Dep. 29:9–23.) While on alternate duty, Pryor worked with Devney to see whether Pryor could work in the freezer. (Pryor Dep. 63:3–19.) Pryor was allowed to leave the freezer to warm up as often as necessary. (Pryor Dep. 63:13–19.) Pryor wore three layers of gloves while working in the freezer, but even with three layers, Pryor would have to leave the freezer after twenty-five to thirty minutes due to pain in his fingers. (Pryor Dep. 64:2–22.)

After Pryor's stint in alternate duty, he and his doctor agreed that Pryor should avoid working in the freezer. (Pryor Dep. 65:9–18.) Pryor's doctor subsequently

5

placed Pryor on temporary restriction of exposure to the freezer for no more than thirty minutes per hour. (Pryor Dep.78:4–15, 79:2–80:8, 81:12–25, 82:10–19, 83:4–13.) At Devney's request, Pryor returned to work at Americold again for a few days in the beginning of July 2014. (Pryor Dep. 133:5–10, 144:17–25.) Pryor spent those days removing trash and pallets from the freezer. (Pryor Dep. 145:1–5.) Pryor was able to work most of the day in the freezer, taking breaks to warm up. (Pryor Dep. 146:3–12.) Pryor was supposed to wait for a phone call from Devney about whether Pryor would return to work. (Pryor Dep. 147:12–25.) On July 9, 2014, Pryor's doctor determined that Pryor had reached maximum medical improvement and released Pryor to work with a permanent restriction of exposure to the freezer for no more than thirty minutes *per workday*. (Pryor Dep. 85:16–86:5.)

Pryor did not return to work at Americold. (Pryor Dep. 88:25–89:2.) In August 2015, Pryor began working for Elwood Staffing, a temp agency. (Pryor Dep. 118:17–23.) Elwood Staffing placed Pryor at Epson Computer, where he became a full-time employee in January 2016. (Pryor Dep. 117:2–4, 118:14–119:5.) In June 2016, Americold terminated Pryor's employment for failure to return from leave, with a termination date of February 16, 2016. (Hollingsworth Dep. 26:12–22; ECF No. 53-14 at 2–4.)

In 2014 and 2015, Americold hired new employees in Indianapolis for several positions: Busdriver/WavePlanner, Wave Planner, Clerk, Dock Clerk, Warehouse Order Selector, Order Selector, Shipping/Receiving Associate, Human Resources Asso-

6

ciate, Human Resources Assistant, Maintenance Helper / Battery Changer, PSM Associate, SuperUser Indy, Office Generalist, Administrative Assistant, Maintenance Apprentice Technician, and Sanitation. (ECF No. 73-15.) The record contains no evidence about the qualifications for or essential functions of these positions.

## Discussion

The ADA's protections apply only if the employee is a "qualified individual." *See* 42 U.S.C. § 12112(a). An individual is "qualified" within the meaning of the ADA only if he is able "with or without reasonable accommodation, [to] perform the essential functions of the employment position such individual holds or desires." 42 U.S.C. § 12111(8). Under the ADA, "reasonable accommodation" may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials, policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9) (emphasis added). Americold contends that Pryor was not a "qualified individual" within the meaning of the ADA because he could not perform the essential duties of an LTO with or without a reasonable accommodation. Pryor disagrees. At issue is whether working in the freezer was an essential function of an LTO at Americold and whether reassignment to a position not involving freezer exposure was a reasonable accommodation.

To determine whether a particular duty is an essential function, the ADA directs courts to consider "the employer's judgment as to what functions of a job are essential,

and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The Seventh Circuit considers "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (quoting *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004)). "We presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Id.*; *see also Jackson v. City of Chicago*, 414 F.3d 806, 811 (7th Cir. 2005) ("We shall not second guess the employer's judgment as to the essential functions of a position.") (internal quotation marks omitted).

Picking items from the freezer was an essential function of Pryor's position as an LTO order selector. Americold understood the job to require substantial exposure to freezer temperatures. (Hollingsworth Dep. 33:23–34:1 ("And thirty minutes in the freezer or refrigerator in a frozen warehouse is just not something we could accommodate in his current job. It doesn't meet the essential functions of his job.").) The LTO job description included the physical requirement of "Constant (67%-100% of the time)" exposure to "Temperature Extreme," described as "Freezer zero – negative 5 degrees." (ECF No. 53-15 at 3.) Pryor testified that, though it varied day to day, he

8

sometimes worked solely in the freezer. (Pryor Dep. 21:24–22:2.) Indeed, on the day of his injury, Pryor spent three-quarters of his shift in the freezer.

In *Shell v. Smith*, 789 F.3d 715 (7th Cir. 2015), the plaintiff was terminated because his disability prevented him from obtaining a CDL or driving a bus, which were listed in the job description for the plaintiff's Mechanic's Helper position. But the plaintiff had held the position for 12 years without driving a bus, and there was testimony that Mechanic's Helpers did not perform such tasks even before the plaintiff had been hired. The Seventh Circuit concluded that "a jury could find that restructuring the task of driving a bus was a reasonable response to a non-essential function of the Mechanic Helper's position rather than a reassignment of an essential duty." *Id.* at 721. In *Kaufmann v. Petersen Health Care VII, LLC*, 769 F.3d 958, the plaintiff, a hairdresser at a nursing home, estimated that she spent 1.71 hours of her 35-hour workweek wheeling residents to and from the beauty parlor. *Id.* at 961. Her employer estimated that the plaintiff spent two-thirds of her workweek wheeling wheelchairs. *Id.* at 962. After surgery, the plaintiff's work restrictions prevented her from pushing wheelchairs, and her employment was terminated. The Seventh Circuit held that summary judgment was inappropriate because pushing wheelchairs "wasn't essential if it was so small a part that it could be reassigned to other employees at a negligible cost to the employer." *Id.* at 962. Here, unlike *Shell*, the job description is consistent with Pryor's experience: though it varied by the day, Pryor sometimes worked entire shifts in the freezer and spent three-quarters of a shift in the freezer

when he suffered his injury. And unlike *Kaufmann*, Pryor's testimony suggests that his time working in the freezer was substantial.

But Pryor also testified that some LTO order selectors—four of the thirty or so LTOs on his shift—worked only in the cooler. (Pryor Dep. 19:12–20, 74:16–23.) David Williams stated in his declaration that some LTOs would be assigned each day to pick orders only in the cooler. (Williams Decl. ¶ 8.) Neither Pryor nor Williams identified any cooler-only LTO order selector by name; nor did they identify the name of the position; nor did they testify whether any such position was temporary (*e.g.*, alternate duty) or permanent (though Williams's declaration indicates the assignments lasted for just a single shift). In *Dargis v. Sheahan*, 526 F.3d 981, 987 (7th Cir. 2008), the plaintiff, a correctional officer, argued that inmate contact was not an essential function because there were officers who were placed in positions to avoid inmate contact. The plaintiff identified three such officers by name and further identified the reasons those officers were given such assignments. Yet the Seventh Circuit held that the plaintiff's testimony was "insufficient to create a genuine issue of material fact on the point" because he "set forth no evidence tending to establish that any of these officers needed to avoid all inmate contact at all times, as in his own case," and his statements "tell us very little about the other officers' conditions, the reasons for their assignment, or the completeness of their isolation from inmates." *Id.* Pryor's and Williams's statements provide far less information than the statements at issue in *Dargis*. Ac-

10

cordingly, Pryor's and Williams's testimony that some unidentified LTO order selectors only picked in the cooler does not create a genuine issue of material fact on whether freezer exposure was an essential function of the LTO position.

It is undisputed that Pryor was unable to work in the freezer for more than thirty minutes per day, so he could not perform the essential functions of his LTO order selector position without reasonable accommodation. He is therefore a "qualified individual" under the ADA only if he could perform the essential functions *with* reasonable accommodation.

Pryor contends that reassignment to a non-freezer position constitutes a reasonable accommodation. Reassignment may be a reasonable accommodation, but only if there is a vacant position for which the plaintiff qualifies. "It is the plaintiff's burden to show that a vacant position exists for which he was qualified." *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). "If such a position is available, then the court may consider whether failure to provide that accommodation was due to a breakdown in the interactive process." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005). Plaintiff has identified several LTO positions that he could have filled despite his injury—runner, loader, and stocker. But there is no evidence that any of those positions were vacant. *See Dargis*, 526 F.3d at 987–88 ("even if the Sheriff's Office did assign some officers to positions where they were able to avoid inmate contact completely, Dargis's testimony does not show that such a position was available when he sought reinstatement"). Moreover, even if Pryor had identified a vacancy, those positions were governed by the union contract, which required that they be

11

filled according to seniority. An accommodation is not ordinarily reasonable if it would violate the rules of a seniority system. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 406 (2002). "[T]he plaintiff must bear the burden of showing special circumstances that make an exception from the seniority system reasonable in the particular case." *Id.* at 405–406.

Pryor also points to evidence that some order selectors worked only in the cooler. If the cooler-only order selector was a permanent position, as Pryor testified, (Pryor Dep. 74:2–6), there is no evidence of any vacancy. The ADA does not require an employer to create a new position or transfer another employee to create a vacancy. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000). If, on the other hand, the cooler-only work was a temporary assignment—lasting only a single shift, as Williams's declaration indicates—the ADA does not require an employer to transfer a disabled employee to a temporary position on a permanent basis. *Gratzl*, 601 F.3d at 681.

Similarly, though Plaintiff has identified several positions that were vacant—administrative assistant, dock clerk, wave planner, PSM associate, human resources associate, etc.—there is no evidence that Plaintiff was qualified for any of those positions. *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 675 (7th Cir. 1998) ("Because she did not propose *any* alternative job for which she satisfied Abbott's prerequisites and whose essential functions she could perform, we conclude that Abbott was entitled to summary judgment."); *Ozslowski*, 237 F.3d at 841 ("even if we assume that the list contains every position vacant during the time period in which Ozlowski requested a

reasonable accommodation, he presented no evidence, other than his own statements, that he was qualified to perform any of these positions"). Pryor therefore fails to create a genuine issue of material fact whether reassignment was a reasonable accommodation.

Much of Plaintiff's brief deals with the breakdown of the interactive process. "[A]n employer's refusal to interact has a tendency to curtail the record, which in turn can frustrate judicial review. But regardless of the state of the record, an employer's failure to engage in the required interactive process need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential function of her job with an accommodation." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 293 (7th Cir. 2015); *see also Majors v. General Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) ("This record wouldn't allow a finding that Ms. Majors was a qualified individual, so whether the discussion between GE and Ms. Majors was sufficiently interactive is immaterial."). As Pryor has not presented sufficient evidence that he was able to perform the essential functions of his job with a reasonable accommodation, he has not established that he was a "qualified individual." *See id.* Americold is therefore entitled to summary judgment.

## Conclusion

For the reasons above, Americold's motion for summary judgment (ECF No. 52) is **granted**, and Pryor's claims are dismissed on the merits with prejudice. Americold's motion to strike Pryor's surreply (ECF No. 80) is **denied as moot**. Final judgment will be entered separately.

Date: 11/5/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Drew Christopher Ambrose
JACKSON LEWIS PC (Indianapolis)
drew.ambrose@jacksonlewis.com

Robin C. Clay
CURLIN & CLAY LAW
rclay@curlinclaylaw.com

Michael W. Padgett
JACKSON LEWIS PC (Indianapolis)
padgettm@jacksonlewis.com